**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:11-cv-00387-SI |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **VARIOUS COINS**, et al., *in rem*, | |
| Defendants, | |
| and | |
| **JAMES HUFF LANGSTON**, | |
| Claimant. | |

S. Amanda Marshall, United States Attorney, Katherine C. Lorenz, Assistant United States Attorney, United States Attorney's Office, District of Oregon, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Plaintiff.

Matthew A. Schindler, 501 Fourth Street #324, Lake Oswego, OR 97034. Of Attorney for Claimant.

**Michael H. Simon, District Judge.**

The United States (the "Government") brings this civil *in rem* forfeiture action against

various items of property (the "defendants *in rem*"). The defendants *in rem* were seized by the

PAGE 1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Government in connection with the criminal investigation and subsequent conviction of James Erick Langston, the son of Claimant James Huff Langston ("Claimant Langston"). Claimant Langston makes a claim as an innocent owner of a portion of the property seized from his son.

The Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355. After all parties waived their right to a jury trial, the Court held a bench trial on January 14-15, 2014. Before trial, both the Government and Claimant Langston stipulated that the defendants *in rem* constitute the proceeds of and were used to facilitate James Erick Langston's criminal activity and that Claimant Langston had no connection to the underlying criminal activity. ECF 75. Thus, the single issue remaining for trial, pursuant to 18 U.S.C. § 983(d), is whether Claimant Langston can prove by a preponderance of the evidence that he is the owner of the defendants *in rem*. Having weighed and evaluated all of the evidence and having considered the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1). For the reasons that follow, the Court finds in favor of the Government.

## FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court finds the following facts by a preponderance of the evidence.

### A.  Credibility of Witnesses

At trial, the Court received testimony from Claimant Langston, James Erick Langston, Homeland Security Investigations ("HSI") Special Agent Robert Priddy, and Cortney Polovina. Having observed and considered the testimony of Special Agent Priddy and Ms. Polovina, the Court concludes that they provided credible testimony. For the reasons stated below, the Court does not find the testimony of Claimant Langston or James Erick Langston to be fully credible.

### 1. **Claimant Langston**

The Court does not fully credit the testimony of Claimant Langston for several reasons. Claimant Langston's claim to the defendants *in rem* has been internally inconsistent and in conflict with the evidence presented at trial. *See infra* Section D.4. While in jail, James Erick Langston made several telephone calls to his father, Claimant Langston. At trial, Claimant Langston testified that many of the statements that he made to his son, James Erick Langston, on those jail calls were "lies." *See infra* Section E.1. This admission makes Claimant Langston's overall testimony less than fully credible. Moreover, during those same telephone calls, Claimant Langston agreed to go to James Erick Langston's home to destroy evidence. This further undermines Claimant Langston's credibility. Ex. 7, Call Dated 5/16/10, 13:45-14:30. In addition, Claimant Langston admitted that in 2004 he relocated his white Liberty safe and the precious metals inside for the purpose of evading both probate and estate taxes. Claimant Langston also admitted that despite consulting with a tax preparer, Claimant Langston had not mentioned his various sales of precious metals to his tax preparer and admitted that he had not paid capital gains taxes on his sales of precious metals, even though these assets had appreciated in value. For all of these reasons, the Court finds Claimant Langston's testimony less than fully reliable.

### 2. **James Erick Langston**

The Court finds that several aspects of James Erick Langston's testimony lack reliability. In James Erick Langston's plea agreement, he agreed that he would "not be a witness in support of any claim his father, Mr. Langston, will file" to the defendants *in rem*. Ex. 1 at ¶17.B; *see infra* Section B. Despite this express agreement, James Erick Langston testified at trial in support of Claimant Langston's claim. Next, James Erick Langston was addicted to methamphetamine and was using other drugs, including marijuana and cocaine, from 2007 through 2010. *See infra*

PAGE 3 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Section D.5. James Erick Langston's continued drug use while accessing the various safes on his property undermines his perceptions and recollections regarding the treatment and ownership of the defendants *in rem* during that time period. *See infra* Section D.5. Finally, James Erick Langston's initial claim to the defendants *in rem* was nearly identical to the HSI inventory that was later shown to be inaccurate, which indicates that neither James Erick Langston nor Claimant Langston can reliably state the types and quantities of metals that each person supposedly owned. *See infra* Section C.1. James Erick Langston's uncertain and inaccurate claim was made despite the fact that he made his declaration "*under the penalty of perjury.*" Ex. 8 (emphasis in original); *see also infra* Section C.1. All of these facts undermine the Court's confidence in the reliability of James Erick Langston's testimony.

## B.  Defendants *In Rem*

On April 14, 2010, a search warrant was served on the residence of James Erick Langston, on Southeast 22nd Street in Washougal, Washington, as part of an investigation into James Erick Langston's drug trafficking activities. A portion of the property seized from James Erick Langston's home during that search is the subject of this civil *in rem* action. Agent Robert Priddy, Special Agent from HSI, supervised the investigation of James Erick Langston. HSI was responsible for collecting the relevant defendants *in rem*.

The Government seized, in relevant part: 80 one-ounce gold coins, five half-ounce gold coins, 1,411 one-ounce silver coins, 40 one-ounce silver bars, one 100-ounce silver bar, three ten-ounce silver bars, eight one-ounce palladium coins, ten one-ounce palladium bars, one German souvenir coin, and mutilated currency in the amount of $13,750. The search of the Southeast 22nd Street house began shortly after HSI agents arrested James Erick Langston a few miles from his residence.

The seized 80 one-ounce gold coins were placed into two separate evidence bags because these coins were seized from different locations. HSI collected the precious metals in the first bag ("Bag One") from the antique safe located in James Erick Langston's office. HSI collected the contents of the second bag ("Bag Two") from the white Liberty safe located in James Erick Langston's living room. In Bag One, there were two one-ounce Walking Liberty/Gold American Eagle Bullion coins, each with a face value of $50, among other items. In Bag Two, there were 26 one-ounce Canadian Gold Maple Leaf coins, 33 one-ounce Walking Liberty/Gold American Eagle Bullion coins, 16 one-ounce South African Gold Krugerrand coins, two one-ounce Isle of Man Gold coins, and one one-ounce Chinese Gold Panda coin among other items.

In addition, the five half-ounce gold coins collected by HSI were in Bag Two. These coins consist of two half-ounce Walking Liberty/Gold American Eagle coins, two half-ounce Chinese Gold Panda coins, and one Canadian Loon Gold Dollar coin that the parties stipulate weighs approximately one half-ounce.

The Government's pre-trial documentation of the defendants *in rem* gold coin property has been neither consistent nor accurate. HSI and other agents initially made limited documentation, noting primarily where the precious metals were found within James Erick Langston's home. The metals were not photographed by federal agents *in situ* before being collected. Special Agent Priddy testified that the agents executing the search warrant may not have collected the precious metals as they were originally packaged if those agents believed the packaging had little evidentiary value. Photographs from the search indicate that the white Liberty safe was located behind a sofa in a corner of the living room. Ex. 6G. Federal agents forcibly opened the safe because James Erick Langston failed to provide its combination when asked for the information after his arrest. Ex. 6C. The contents of the safe were laid out in order

PAGE 5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

to be itemized on the custody receipt form. Exs. 3, 6D. There are several types of packaging from the safe, such as a black ammunition box, a black metal tube, and a small wooden box, that were not seized by federal agents. Ex. 6D.

The custody receipt for the defendants *in rem* incorrectly listed 83 one-ounce gold coins seized from one location and two one-ounce gold coins seized from another, totaling 85 one-ounce gold coins. Ex. 3. After the search of James Erick Langston's home, Special Agent Priddy and HSI created a written inventory of the seized assets. Ex. 4. That inventory incorrectly listed, in relevant part, 1,451 one-ounce *gold* coins/bars, 85 one-ounce gold coins, three ten-ounce silver bars, one one-hundred-ounce silver bar, and 18 one-ounce palladium coins/bars. *Id.* At trial, the Government explained that the inventory listing of 1,451 one-ounce *gold* coins/bars should have read 1,451 *silver* coins/bars. Further, several months before trial, Claimant Langston inspected the defendants *in rem* and discovered two half-ounce gold coins, to which he makes no claim. These half-ounce gold coins were not documented in HSI's inventory.

Special Agent Priddy clarified during his testimony that he reviewed and conducted another inventory of the gold coins and found two half-ounce gold coins in Bag Two. After this portion of Special Agent Priddy's testimony, the Court requested an accounting in court of the types and weights of the defendants *in rem* gold coins. The weights and denominations of the gold coins at issue are accurately reflected in the Court's Findings of Fact noted above, to which the Government and Claimant stipulated in open court.

**C.  Conflicting Claims to the Defendants *In Rem***

**1.  Claims by James Erick Langston**

On June 25, 2010, James Erick Langston completed a Seized Asset Claim Form requesting that U.S. Customs and Border Protection refer the case for court action pursuant to 18

U.S.C. § 983(a)(2)(C). Ex. 8. In Part I of the Seized Asset Claim Form, James Erick Langston

listed the following items to which he claimed an interest:

> 85 one-ounce gold coins, 1,411 one-ounce silver coins, 8 one-ounce Palladian coins, 1 one-hundred ounce silver bar, 3 ten-ounce silver bars, 40 one-ounce silver bars and 10 one-ounce Palladian bars, seized from [his] residence in Washougal, WA, on April 14, 2010.

*Id.* In Part II of the form, James Erick Langston stated that he "purchased [the items listed in

Part I], jointly with [his] father, James Langston, Sr., or individually, from 1994 to 2000." *Id.* On

Part III of the form, James Erick Langston printed and signed his name attesting and declaring

"*under penalty of perjury* that the information provided in support of [his] claim is true and

correct to the best of [his] knowledge and belief." *Id.* (emphasis in original).

James Erick Langston's Seized Asset Claim Form was nearly identical to the inaccurate

HSI inventory. James Erick Langston testified that his criminal defense attorney recommended

that James Erick Langston make a claim to all the defendants *in rem* and work out later what

property was actually his. James Erick Langston's former criminal defense attorney filled out the

form based on James Erick Langston's instructions. James Erick Langston signed the form after

Parts I and II of the form were complete.

On March 3, 2011, James Erick Langston entered into a plea agreement with the

Government in the separate criminal case. Ex. 1. James Erick Langston pleaded guilty to Count 1

of the indictment, which charged a conspiracy to possess and distribute marijuana in violation of

21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), and 846. *Id.* ¶ 2.

As part of his signed plea agreement, James Erick Langston "knowingly and voluntarily

forfeit[ed] all right, title, and interest in and to all assets subject to forfeiture," and admitted that

the seized assets "constituted the proceeds of [his] criminal activity, were used to facilitate [his]

criminal activity and were involved in [his] criminal activity in violation of Title 21, United

PAGE 7 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

States Code, Sections 841(a)(1) and 846 as set forth in Count 1 of the indictment." *Id.* ¶ 17.A.

The plea agreement obligated James Erick Langston to "withdraw any claim already filed to any

of the listed property in any civil proceeding." *Id.* ¶ 17.B. The following property was listed in

James Erick Langston's plea agreement: "1,451 one-ounce silver coins/bars, 83 one-ounce gold

coins, 3 ten-ounce silver bars, 1 one-hundred-ounce silver bar, 9 one-ounce palladium bars/coins,

2 one-ounce gold coins, [and] Mutilated US currency recovered from" the house on Southeast

22nd Street in Washougal, Washington. Ex. 1 ¶ 17.B.

Also in his written plea agreement, James Erick Langston "explicitly agree[ed] he

[would] not be a witness in support of any claim [that] his father, Mr. Langston, [would] file." *Id.*

James Erick Langston violated his plea agreement and appeared as a trial witness in this case. He

also filed several declarations in support of Claimant Langston's various pretrial motions and

arguments.

### 2.  Claim by Claimant Langston

On May 31, 2011, Claimant Langston submitted his Petition for Return of Property and

made a claim as an innocent owner of a portion of the property seized from the April 14, 2010

search, including: 85 one-ounce gold coins, 1,411 one-ounce silver coins, 40 one-ounce silver

bullion bars, one 100-ounce silver bullion bar, three ten-ounce silver bullion bars, eight one-

ounce palladium coins, and ten one-ounce palladium bars. Claimant's Pet. at 1, ECF 16.

Claimant Langston testified at trial that his claim for gold coins includes only the one-ounce

variety and no other weights, that he delivered the precious metals to his son in 2004, and that he

is the innocent owner of that property. *See infra* Section D.4.

**D. Claimant Langston's Alleged Delivery of Precious Metals**

    **1. Claimant Langston's History of Collecting Precious Metals**

Claimant Langston has been a lifelong collector of precious metals and coins. He learned the trade from his own father, and in turn taught it to his only child, James Erick Langston, including teaching him about where, when, and how to purchase precious metals on his own behalf. Claimant Langston's father made gifts of precious metals to both Claimant Langston and James Erick Langston. Claimant Langston's grandfather and father mined large quantities of gold and silver from the family's mine in Idaho. Claimant Langston now owns this mine, which has been passed down through several generations of his family.

After running a successful business in California for 25 years, Claimant Langston closed his business and sold his home in Huntington Beach, California. He invested the proceeds of the sale in precious metals. Claimant Langston later moved to Southern Oregon where he continued to invest in precious metals.

Between 1994 and 1997, Claimant Langston stored his collection of gold in a safe on his father's property because he and his wife were traveling. Before doing so, Claimant Langston created a detailed inventory of the precious metals he was placing on his father's property so that there would be no misunderstanding regarding ownership. Ex. 5. The inventory included a column describing the type, quantity, spot price value, date of purchase, and total value of each type of coin in Claimant Langston's collection. *Id.* The running total of Claimant Langston's precious metals indicated a total value of approximately $688,000 for all assets held at the time. *Id.* Claimant Langston also testified that he does not typically keep lists of his precious metals because he believes that such written inventories represent a "security risk."

### 2. James Erick Langston's History of Collecting Precious Metals

Claimant Langston's son, James Erick Langston, was taught about precious metals by Claimant Langston. Like Claimant Langston, James Erick Langston has invested in precious metals for many years. James Erick Langston first learned about precious metals in his early teenage years. When he had money in the past, he typically invested that money in precious metals rather than in other investment vehicles, such as stocks. Beginning in 1993 and until his death in 1997, James Erick Langston's grandfather gave gifts of precious metals to James Erick Langston.

James Erick Langston had a history of buying and selling precious metals. This history was known by Cortney Polovina, James Erick Langston's former wife. Ms. Polovina had been to precious metal dealers on four occasions with James Erick Langston. James Erick Langston managed the couple's finances during his marriage to Ms. Polovina, but Ms. Polovina believed that she knew of James Erick Langston's activities because he would have had "no reason to hide" that information from Ms. Polovina. The evidence shows that James Erick Langston, at various times, sold gold coins (totaling $4,683), gold bars (totaling $4,731.50), and other precious metals (totaling $2,861). Ex. 10.

James Erick Langston kept an inventory of his precious metals in an 8.5-by-11-inch spiral-bound notebook. He would write down what types of metals he bought, how much he paid for them, and any related fees. James Erick Langston last remembered his inventory notebook being in the antique safe kept in his office. The notebook was not presented at trial, and James Erick Langston believes that it has been lost.

### 3. Loans Between Claimant Langston and James Erick Langston

In 2000, James Erick Langston went into business with another individual in Bend, Oregon and formed AAA Storage Depot, LLC. The business involved mini-storage services and

the sale and rental of large storage containers. Claimant Langston made two loans to James

Erick Langston to help start the business. Both were documented. The first loan, made on

May 23, 2001, noted that it was a $30,000 loan and a $10,000 investment in the business.

Ex. 229. The second loan occurred on April 15, 2004, and Claimant Langston noted a $25,000

"loan" and a $5,000 "pmt." Ex. 230. James Erick Langston has repaid these two loans and other

undocumented loans. James Erick Langston currently owes his father approximately $70,000 for

undocumented loans he received after his arrest to keep his home out of foreclosure and pay for

criminal defense costs.

### 4. Claimant Langston's 2004 Delivery of the White Liberty Safe

On August 4, 1999, a white Liberty safe was purchased from the Rogue Safe Company in

Medford, Oregon for $2,299. Ex. 228. The name listed on the receipt is "James Langston," and

the address listed on the receipt is "Box 2650 N.E. Hwy 20 #G15, Bend, OR 97701." *Id.*

Claimant Langston had this safe in his possession until 2004.

On May 24, 2004, Claimant Langston hired a company to move the safe from an address

located in Oregon to James Erick Langston's and Ms. Polovina's home address on Y Street in

Washougal, Washington. Ex. 227. Ms. Polovina had no knowledge of Claimant Langston's

involvement with the white Liberty safe. When several men delivered the safe, Ms. Polovina

asked that the safe be placed in the living room because she thought it was a "beautiful piece of

furniture."

Claimant Langston testified that shortly after the safe was delivered he made several trips

to his son's home to deliver a total of $50,000 worth of various precious metals. Claimant

Langston offered various descriptions, which often conflict, regarding the types of metals he

delivered in 2004. Claimant Langston's Petition for Return of Property originally listed 85 one-

ounce gold coins as a part of the property that he purportedly owns. Claimant's Pet. at 1, ECF 16.

PAGE 11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

There is no contemporaneous documentation of the types and quantities of coins delivered in 2004. James Erick Langston testified that although he kept an inventory of his own precious metals and documented the delivery of the safe, he lost the spiral-bound notebook with this information and thus could not produce it at trial. There are no other witnesses to the 2004 delivery of precious metals.

In November 2013, Claimant Langston inspected the defendants *in rem* and discovered two half-ounce gold coins. Claimant Langston testified at trial that he never delivered half-ounce gold coins to his son in 2004, and thus at the beginning of trial made claim to only 83 one-ounce gold coins. On cross-examination at trial, the Government asked Claimant about the quantity and type of gold coins delivered to his son in 2004. Claimant Langston stated that all he could say was that "there were 85 gold coins." This testimony conflicted with Claimant Langston's earlier deposition testimony, where he was able to identify the specific types of coins delivered. He said that the gold coins delivered in 2004 were "probably mostly [South African Gold] Krugerrand" coins.

At trial, the Court asked Claimant Langston if he could recall the quantity and types of gold coins he delivered to his son in 2004. Claimant Langston initially testified that he only delivered one-ounce gold coins and that they were an equal mix of Walking Liberty/Gold American Eagle Bullion coins, Canadian Gold Maple Leaf coins, South African Gold Krugerrand coins, and Chinese Gold Panda coins. The actual inventory of the defendants *in rem* at trial, however, revealed 80 one-ounce gold coins, consisting of 35 Walking Liberty/Gold American Eagle Bullion coins, 26 Canadian Gold Maple Leaf coins, 16 South African Gold Krugerrand coins, two Isle of Man Gold coins, and one Chinese Gold Panda coin. When asked by the Court if the Isle of Man Gold coins were among the precious metals delivered in 2004,

Claimant Langston stated that he did not own any such coins. James Erick Langston testified,

however, that the Isle of Man Gold coins did not belong to him and, therefore, must belong to

Claimant Langston.

The shifting descriptions of the defendants *in rem* undermine the reliability of

Claimant Langston's testimony. Claimant Langston drafted his claim based largely on the HSI

inventory from the April 14, 2010 search, which ultimately turned out to be inaccurate, rather

than on any independent knowledge.

Claimant Langston also testified that he only delivered a "round number" or non-

fractional amounts and sizes of coins. Generally, the metals Claimant Langston purchased and

stored were kept in packaging that he found distinctive, such as plastic containers for the coins

(Exs. 203, 205, 206, 212, 216, 220, 225, 226), plastic sleeves for individual coins (Ex. 222), a

black ammunition box (Exs. 204, 205), black metal tubes used to bury packaged metals

(Ex. 207), and folios used to store one-ounce silver bars (Ex. 213). Claimant Langston testified

that he recognized the defendants *in rem* as his own because he saw some of the same types of

packaging he uses in his personal collection. *See* Exs. 203-223. Moreover, some of the packaging

found in the white Liberty safe had similar markings to those that Claimant Langston makes on

his precious metal storage containers. *See* Exs. 220, 224-26.

The packaging described by Claimant Langston is not strong probative evidence that the

he is the owner of the defendants *in rem*. This is because coins are often sold in plastic containers

or sleeves, according to Claimant Langston's own testimony. To the extent similar packaging

was found in the white Liberty safe, the Court also notes that James Erick Langston freely and

regularly accessed the safe after it was delivered to James Erick Langston's house in 2004. *See*

*infra* Section D.5. It is likely that James Erick Langston, because of his drug use and mental state

during the period when the precious metals were in his possession and care, comingled or reused packages. *See id.*

The arrangement and understanding between Claimant Langston and his son regarding the 2004 delivery of the white Liberty safe was undocumented, and there are multiple and inconsistent explanations of the parties' understanding of the arrangement. Claimant Langston testified that he never intended to give his son a gift during Claimant Langston's life, but instead, only intended for his son to be able to access the precious metals in order to close Claimant Langston's estate upon Claimant Langston's death. Claimant Langston also testified that he gave James Erick Langston the combination to the safe, and intended to allow him free access to the safe. Claimant Langston, however, stated in his deposition testimony that his son was not supposed to access the white Liberty safe during Claimant Langston's lifetime. The Court does not credit either statement and finds more probative Claimant Langston's admission on the jail calls that he had previously made a gift to his son. *See infra* Section E.1.

Based on these facts, the Court finds that Claimant Langston intended the precious metals delivered to his son in 2004 to be a gift. Those precious metals were not delivered for James Erick Langston's use only upon Claimant Langston's death or merely for safekeeping; instead, the arrangement allowed James Erick Langston uninterrupted, unfettered, and full use of the white Liberty safe and the contents therein. The parties' multiple admissions made during the jail calls that the precious metals were a gift further supports this conclusion. The Court does not credit either Claimant Langston's or James Erick Langston's later disavowal of those statements. The parties failed to provide sufficiently reliable evidence to the contrary regarding ownership of the defendants *in rem*.

**5.  Treatment and Possession of the Safe from 2004 Through the 2010 Search**

The white Liberty safe remained at James Erick Langston's and Ms. Polovina's home on Y Street in Washougal, Washington until the couple moved to Southeast 22nd Street in Washougal, Washington in early 2006. James Erick Langston paid to have the white Liberty safe moved. The white Liberty safe was maintained in James Erick Langston and Ms. Polovina's living room in their home on Southeast 22nd Street.

James Erick Langston regularly accessed the white Liberty safe, typically a few times a week, to add and remove contents. James Erick Langston stored his own cache of guns and precious metals in the safe, along with some of Ms. Polovina's jewelry and bonds she received from an uncle. James Erick Langston frequently bought metals from eBay.com, and when coins would arrive in the mail, Ms. Polovina witnessed James Erick Langston place them in the white Liberty safe. Ms. Polovina did not take an inventory of what was in the safe, nor did she closely observe the specific items that James Erick Langston kept in the safe. James Erick Langston testified that he purchased and placed precious metals in the white Liberty safe from approximately 2003 through 2006. The Court notes that this approximate date range is partially inconsistent with the date the white Liberty safe was actually delivered to James Erick Langston in 2004.

In approximately April 2006, James Erick Langston and Claimant Langston had a "falling out" over what James Erick Langston believed was the inappropriate treatment of his mother, Claimant Langston's former wife, Helen Langston. Claimant Langston did not believe it was a "catastrophic end" to his relationship with his son. After this "falling out," which occurred in approximately April 2006, James Erick Langston had limited contact with his father. The only contact described was in 2007 when Claimant Langston came to Oregon to help run the AAA Storage Depot business during James Erick Langston's divorce. After 2007, Claimant Langston

PAGE 15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

and James Erick Langston were not in contact again until James Erick Langston contacted his father while being held in jail after his April 14, 2010 arrest. Because James Erick Langston and Claimant Langston had limited contact during the four years leading up to the execution of the search warrant, Claimant Langston had no knowledge of his son's drug trafficking.

In approximately October 2006, Ms. Polovina left James Erick Langston after discovering his cocaine. After this incident, Ms. Polovina initiated divorce proceedings. The divorce was not amicable and involved the division of personal and business assets, as well as custodial issues related to their two children. By 2007, the divorce proceedings between James Erick Langston and Ms. Polovina were contentious, and James Erick Langston was jailed for contempt of court. After losing the AAA Storage Depot business in his divorce, James Erick Langston supported himself through the sale of precious metals and by trafficking marijuana.

James Erick Langston was addicted to drugs between 2007 and 2010, and was using marijuana, cocaine, and methamphetamines. Although he contends that the contents kept on the bottom shelf of the white Liberty safe were his father's property, James Erick Langston also testified that during this time period, he regularly accessed the safe and had both anger and memory issues while on drugs. James Erick Langston testified that his sleep and memory were "possibly" affected by drugs and that he did things that did not make sense. For example, James Erick Langston described taking precious metals from a secure safe and placing them in an unsecure area, such as his toolbox. The Court finds that James Erick Langston's continued drug use while accessing the various safes on his property led to a comingling of property that makes it impossible to know for certain that the materials seized on the bottom shelf of the white Liberty safe were the same contents that Claimant Langston delivered in 2004.

### E.  Jail Calls from James Erick Langston

James Erick Langston was arrested on April 14, 2010, and detained for approximately 18 months before beginning to serve his sentence. Between May 16, 2010 and June 25, 2010 and before entering a plea agreement with the Government on March 3, 2011, James Erick Langston made several telephone calls to his father, Claimant Langston, and his mother, Helen Langston. Exs. 7, 7a. During the time the telephone calls were made, Claimant Langston and James Erick Langston had received limited discovery in James Erick Langston's criminal matter, but both testified that they had received the inventory prepared by HSI. *See* Ex. 4.

#### 1.  Calls from James Erick Langston to Claimant Langston

James Erick Langston and Claimant Langston discussed in several telephone calls the logistical details necessary for Claimant Langston to provide money to James Erick Langston in order: (1) to keep the Southeast 22nd Street house out of foreclosure; and (2) to pay for James Erick Langston's criminal defense costs. Both James Erick Langston and Claimant Langston testified that Claimant Langston provided approximately $70,000 for these purposes and that this money was not a gift but, instead, a loan made by Claimant Langston to his son.

During their jail calls, Claimant Langston made several statements to his son that cast doubt on Claimant Langston's ownership of the defendants *in rem*. On two of the jail calls, Claimant Langston made reference to delivering platinum in 2004 with the other precious metals. He testified at trial, however, that he is making no claim to platinum and never delivered platinum to his son.[1] *See* Ex. 7, Call Dated 5/25/10, 6:17-11:12; Ex. 7, Call Dated 6/04/10, 2:15-2:45. In addition, Claimant Langston was aware of the mistakes on the HSI inventory, and both

---

[1] Platinum is not at issue in this trial. This testimony is probative, however, because it demonstrates the inconsistency between Claimant Langton's statements during the jail calls with his son and Claimant Langston's testimony at trial.

Claimant Langston and James Erick Langston were "excited" about the prospect of taking advantage of HSI's erroneous listing of "1,451 one-ounce gold coins/bars" because the spot price of gold is higher than silver and could yield approximately $1,800,000 in the sale of gold. *Id.*; *see also* Ex. 4. Claimant Langston regarded the HSI inventory mistake as "cool." Ex. 7, Call Dated 6/04/10, 2:15-2:45. Both Claimant Langston and James Erick Langston also discussed getting the details that Claimant Langston could use on his Petition for Return of Property from James Erick Langston's criminal defense attorney. Ex. 7, Second Call Dated 6/10/10, 12:15-13:45.

Claimant Langston also referenced the defendants *in rem* as "gifts" that he previously gave to his son. On June 7, 2010, Claimant Langston made the following statement regarding the defendants *in rem*: "That's what I gave it to you for, to get over the divorce problems." Ex. 7, Call Dated 6/07/10, 13:15-14:00. On June 10, 2010, Claimant Langston also stated that: "If it came down to brass tacks, I suppose I could just bring mine out and say, look, I've got this much more . . . I gave him half of what he had because of his divorce and losing his business." Ex. 7, First Call Dated 6/10/10, 7:45-8:05. On that same call, Claimant Langston admitted that he did not keep receipts or records of the precious metals he purchased. *Id.* at 7:23-7:35.

Claimant Langston also admitted during trial that he "lied" on many of the recorded jail calls, including in: (1) the statements on May 25, 2010, where Claimant Langston claimed to have delivered platinum to his son; (2) the statements on June 4, 2010, where Claimant Langston again referred to a delivery of platinum; (3) the statements on June 7, 2010, where Claimant Langston stated that he had given the precious metals to his son as a gift to help him get over the divorce; and (4) the June 10, 2010 statements where Claimant Langston his son that Claimant Langston was willing to say that he gave James Erick Langston precious metals

because he was losing his business. Claimant Langston attempted to explain these lies by saying that he made them during an "angry" emotional state, that he thought that the lies could help his son's case, that he "misspoke," that he was "speaking from a position of opportunity," and that he was "speaking without thinking."

Counsel for Claimant Langston asked if Claimant Langston made some of the false statements because he believed that the statements could help his son's criminal case. Claimant Langston responded, "Yes." When asked by the Court, however, how he thought that the statements would help James Erick Langston's criminal case, Claimant Langston stated that he "does not know how it would help his son's case" and that he was "speaking without thinking." The Court also asked James Erick Langston about the financial situation related to his divorce and the fact that he lost his business to Ms. Polovina in the divorce. James Erick Langston admitted that he had cash flow problems, but maintained that he did not ask his father for help and that his father did not give him any assistance.

The Court did not receive a cogent explanation from Claimant Langston regarding how the statements could help his son. Although Claimant Langston stated that he took his oath to the Court seriously, Claimant Langston's admittedly false statements make his testimony less than fully reliable. *See supra* Section A.1.

### 2. Calls from James Erick Langston to Helen Langston

The evidence at trial also included recordings of two telephone calls from James Erick Langston to his mother, Helen Langston. The first call occurred on June 8, 2010. Ex. 7, Call Dated 6/08/10, 7:28-10:27. On that call, Helen Langston stated that Claimant Langston told her that it was Claimant Langston's "silver that he was sending [James Erick Langston] for the house." *Id.* at 9:45-10:10. James Erick Langston responded that "a lot of it is," but that "he [Claimant Langston] gave me some, some of the gold was his." *Id.* at 10:10-10:20. At trial,

PAGE 19 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

James Erick Langston testified that his father had not given him anything as a gift and that the statements he made on this telephone call were not accurate. The Court does not find this portion of James Erick Langston's testimony credible.

The recording of the second telephone call occurred on June 25, 2010. Ex. 7, Call Dated 6/25/10, 10:15-45. On that call, James Erick Langston told his mother that "the problem is, I don't know how much of it is mine and how much of it is his . . . he's got the list, so, I don't know, I'll figure it out." *Id.* at 10:35-10:45. When asked about the call on cross-examination, James Erick Langston admitted that he was referring to the precious metals delivered to his home in 2004. There was no explanation of the "list" that Claimant Langston supposedly had.

These calls support the conclusion that Claimant Langston made a gift of the precious metals to his son James Erick Langston in 2004.

## CONCLUSIONS OF LAW

Based on the foregoing Findings of Fact and the legal standards that follow, the Court makes the following Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1).

## A.  Legal Standards

The procedures relevant for a civil *in rem* forfeiture action are governed by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 981, *et seq.*, Rules C, E, and G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, ("Supplemental Rules"), and the Federal Rules of Civil Procedure.

### 1.  Innocent Ownership Defense Under CAFRA

Under the provisions of CAFRA, the Government must prove the forfeitability of the defendant property by a preponderance of the evidence. 18 U.S.C. § 983(c). Here, the Government established forfeitability of the defendants *in rem* through the stipulated facts. ECF 75. Thus, the burden shifts to Claimant Langston to prove by a preponderance of the

evidence that he is actually the innocent owner of the defendant property under 18 U.S.C.

§ 983(d). *See United States v. Ferro*, 681 F.3d 1105, 1109 (9th Cir. 2012); *United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo-Prop Aircraft*, 619 F.3d 1275, 1278 (11th Cir. 2010). Under Section 983(d)(1), "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." The statute provides that the term "owner" "means a person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest." 18 U.S.C. § 983(d)(6)(A).

An owner does not include "a nominee who exercises no dominion or control over the property." 18 U.S.C. § 983(d)(6)(B)(iii). Although "nominee" is not defined by the statute, case law interpreting nominal ownership focuses on the degree, quality, and genuineness of the claimant's dominion or control over the defendant property. *United States v. One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft*, 659 F. Supp. 2d 1260, 1267-68 (S.D. Fla. 2009). "If the degree of dominion or control is small, or if it is merely a cover for the control exercised by the true owner, it is tantamount to no dominion or control at all and divests the claimant of the status of owner." *Id.* at 1268-69 (collecting cases where the claimant's ownership was not proven by a preponderance of the evidence). "[E]xercising *some* dominion or control suffices to prove that a claimant is not a mere nominee." *One 1990 Beechcraft*, 619 F.3d at 1278 (emphasis in original). The requirement that the claimant have both an ownership interest and "dominion or control ensures that claimants have at least some actual connection to the property in question; they cannot be only bare title holders." *Id.* at 1279.

Because the parties are in agreement that Claimant Langston has satisfied the "innocent" component of Section 983(d)(2), the determinative question is whether Claimant Langston has an ownership interest recognized by Section 983(d)(3)-(6).

### 2.  Washington State Law on Property Ownership

A claimant's ownership interest in property is governed by the law of the state in which the ownership interest arose. *United States v. Real Property located at 5208 Los Franciscos Way, Los Angeles, Cal.*, 385 F.3d 1187, 1191 (9th Cir. 2004). Claimant Langston testified that he personally transported the defendants *in rem* to Washington State and delivered them to James Erick Langston's home in Washougal, Washington. Thus, Washington state law applies to the question of property ownership.

Under Washington state law, a transfer of property constitutes a completed gift where there is: (1) an intention of the donor currently to give; (2) a subject matter capable of passing by delivery; (3) a delivery as perfect as the nature of the property and the circumstances and surroundings will reasonably permit; and (4) acceptance by the donee. *In re Marriage of Zier*, 147 P.3d 624, 628 (Wash. App. 2006). The donor must have a present intention to make a gift. *Sinclair v. Fleischman*, 773 P.2d 101, 103 (Wash. Ct. App. 1989). "The existence or absence of intent to make a gift is an evidentiary issue to be resolved by the finder of the fact." *Buckerfield's Ltd. v. B.C. Goose & Duck Farm Ltd.*, 511 P.2d 1360, 1363 (Wash. App. 1973). An incomplete gift confers no right in the donee. *Sinclair*, 773 P.2d at 103.

Washington state law also provides that "an unexplained gratuitous transfer of property from . . . parent to child" raises the "presumption of [a] gift." *Lappin v. Lucurell*, 534 P.2d 1038, 1041 (Wash. App. 1975). An unexplained transfer is best understood as a transfer of property or money without any contemporaneous documentation. *See In re Estate of Miller*, 143 P.3d 315, 317 (Wash. App. 2006) (involving a transfer of money from a mother to a son without

PAGE 22 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

documentation). "[T]his presumption can be overcome by proof that is certain, definite, reliable and convincing and leaves no reasonable doubt as to the intention of the parties." *Buckerfield's Ltd.*, 511 P.2d at 1363.

## B.  Ownership of the Defendants *In Rem*

### 1.  Ownership of the Specific Property

Claimant Langston bears the burden of proving by a preponderance of the evidence that he has an "ownership interest in the *specific* property sought to be forfeited." 18 U.S.C. § 983(d)(6)(A) (emphasis added). At trial, Claimant Langston's only evidentiary bases for claiming ownership were his recollection of the precious metals that he delivered to James Erick Langston in 2004, and James Erick Langston's recollection that the transfer occurred. There is no documentation of the specific metals that Claimant Langston purchased. The Court notes that neither Claimant Langston nor James Erick Langston consistently described the property delivered in 2004, no contemporaneous documentation was submitted to the Court, the relevant testimony from the parties was not fully credible, for at least three years James Erick Langston freely accessed and exchanged the precious metals in the white Liberty safe during the time he was engaged in drug-related activities, and Claimant Langston's petition for return of property appears to be largely based on the inaccurate HSI inventory of the items seized at James Erick Langston's home.

This evidence falls short of meeting Claimant Langston's burden of proving that he has an ownership interest in the *specific* property at issue in this case. *See* 18 U.S.C. § 983(d)(6)(A). Claimant Langston does not even appear to be a "nominee" within the meaning of Section 983(d)(6)(B)(iii) because he lacked dominion and control over the property he delivered in 2004. *Cf. United States v. Nava*, 404 F.3d 1119, 1135-36 (9th Cir. 2005). Thus, Claimant Langston has

failed to establish by a preponderance of the evidence that he is an innocent owner as defined by 18 U.S.C. § 983(d).

### 2. Presumption of a Gift under Washington Law

The Court also concludes that Claimant Langston failed to rebut the presumption under Washington state law that an unexplained transfer of property from a parent to a child raises the presumption that the transfer was a gift. *See Buckerfield's Ltd.*, 511 P.2d at 1363. The white Liberty safe and precious metals were capable of delivery and were delivered to James Erick Langston in 2004, and based on James Erick Langston's use of and control over those materials, he accepted delivery. The remaining issue is whether Claimant Langston can rebut the presumption that he intended to make a gift to James Erick Langston in 2004. Claimant Langston bears the burden of proving by "certain, definite, reliable and convincing [evidence that] leaves no reasonable doubt as to the intention of the parties." *Id.* Because there was no contemporaneous documentation of the 2004 transfer or third-party witnesses with knowledge of the transfer and its terms, the sole bases for rebutting this presumption are the testimonies of Claimant Langston and James Erick Langston. Based on the Court's findings regarding credibility, *see supra* Section A, the Court does not find this testimony particularly reliable.

The treatment of the safe by James Erick Langston, and multiple admissions from Claimant Langston when discussing the defendants *in rem* as gifts while James Erick Langston was in jail reinforces, rather than rebuts, the presumption of a gift. Moreover, where Claimant Langston has intended to retain ownership over property in the past, such as when he stored materials on his own father's property between 1994 and 1997, Claimant Langston created documentation to avoid any confusion. No such documentation was submitted to the Court with respect to Claimant Langston's delivery of the white Liberty safe and precious metals to his son.

Thus, the Court concludes that the 2004 transfer of precious metals from Claimant Langston to James Erick Langston was a gift.

## CONCLUSION

The Court finds that the defendants *in rem* are subject to forfeiture pursuant to 18 U.S.C. § 983(c) and 21 U.S.C. § 881(a). The Court further finds that there is insufficient proof to satisfy the "innocent ownership" claim by a preponderance of the evidence pursuant to 18 U.S.C. § 983(d). The defendants *in rem* are hereby forfeited to the United States of America. The Government is directed to present a Final Order of Forfeiture.

**IT IS SO ORDERED**.

DATED this 31st day of March, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge